

FILED

Jun 05 2019, 8:43 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Brian A. Karle
Ball Eggleston, PC
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tyler G. Banks
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Michael A. Johnston, Jr.,<br>*Appellant-Defendant*,<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff*. | June 5, 2019<br><br>Court of Appeals Case No.<br>18A-CR-2478<br><br>Appeal from the Montgomery<br>Superior Court<br><br>The Honorable Heather Barajas,<br>Judge<br><br>Trial Court Cause No.<br>54D01-1806-F6-1870 |

**Brown, Judge.**

[1] Michael A. Johnston, Jr., appeals his convictions and sentence for domestic battery as a level 6 felony, criminal mischief as a class B misdemeanor, two counts of disorderly conduct as class B misdemeanors, and two counts of resisting law enforcement as class A misdemeanors. He raises three issues which we revise and restate as:

I. Whether the trial court properly removed him from the courtroom;

II. Whether his conviction for disorderly conduct violates double jeopardy; and

III. Whether his sentence is inappropriate in light of the nature of the offenses and his character.

We affirm in part, reverse in part, and remand.

## Facts and Procedural History

[2] Johnston lived with Shameka Howard in Crawfordsville, Indiana, and they had two children. At about 10:20 a.m. on June 25, 2018, Betty Brooks who lived in Crawfordsville and her daughter, Elizabeth Reams, heard some very loud screams by a woman and a lot of yelling and screaming. Johnston shoved and swung at Howard. He "[p]ushed her out into the street" and "[s]macked her around several times." Transcript Volume II at 42. Howard placed the children on the hood of a vehicle, and Johnston picked up and threw big heavy toys at the vehicle "with the kids sitting there." *Id.* He shoved her down. She placed the children in the car and "was trying to get out of there" when he picked up a brick and threw it at the window which shattered. *Id.*

[3] At approximately 10:29 a.m., Brooks called 911. Crawfordsville Police Officer Geoffrey Payne responded within two minutes to a dispatch regarding a domestic altercation involving a male who had thrown a brick at a vehicle and a female who was thrown or pushed into the street. The dispatch also indicated that the male suspect had left on foot and the female victim had left in a vehicle that may have sustained damage to the window. Officer Payne arrived at the scene, and Johnston, who matched the description of the male in the dispatch, approached him, held his arms up, and said, "just take me to jail." Transcript Volume I at 238. Officer Payne immediately detected a strong odor of alcoholic beverages, noticed that Johnston's speech was slurred and his eyes were bloodshot, and observed a brick that was broken in half in the yard, a complete brick in the grass beside the apartment, and a child's toy upside down in the driveway.

[4] Crawfordsville Police Corporal Julian Todd Huckstep responded to the dispatch and observed a vehicle matching the description with a shattered windshield. He activated his emergency lights, the vehicle stopped, and he approached the vehicle at approximately 10:35. He observed a female driver, two children in the back seat, a brick in the vehicle, and shards of glass lying in the front portion of the vehicle. The driver identified herself as Howard. He asked her if she would fill out a voluntary statement, and she said that "she did not want him to go to jail." Transcript Volume II at 26. Howard also stated that they had been involved in an argument, he was drunk, she attempted to leave the apartment, and he shoved her. Crawfordsville Police Officer Jared

Manago also responded to the dispatch and observed shards of glass and a brick on the front passenger floorboard.

[5] At the jail, Johnston refused to give a portable breath sample, and Officer Payne transported him to the hospital to determine if he was fit for incarceration. Officer Payne told him that they were at the hospital to "get cleared for incarceration" and asked him to exit the vehicle. Transcript Volume I at 242. Johnston refused and "began basically provoking [him] into having a ground fight." *Id.* Officer Payne "tried to talk him down," but Johnston refused to cooperate. *Id.* Officer Payne turned on his video camera and asked for additional officers.

[6] While Officer Payne waited for other officers, Johnston stood up and tried to walk past and away from him, and Officer Payne grabbed his arm and "had to pull him back against the car," and Johnston "continued to pull away from [him] with his arm and twist and tr[ied] to get away from [him]."[1] *Id.* at 243. Officer Payne pinned him against the squad car and held him there until other officers arrived to help transport him into the emergency room. After other officers arrived, he complied initially physically but maintained his "verbal abuse" which included being very loud, screaming, and using profanity. *Id.* In the hospital, Corporal Huckstep told him to calm down, and once Johnston was

---

[1] When asked what part of his body he was twisting as he was trying to stop him, Officer Payne answered: "He was using his upper torso as well as, I mean, his lower half, too, pushing against the ground, I guess. Mainly with his upper torso and his arms." Transcript Volume I at 243.

in the emergency room, multiple nurses and doctors told him to quiet down and quit yelling and disturbing the other patients. At one point, Corporal Huckstep and other officers tried to keep Johnston safe and secure on a gurney and had to hold his legs or arms while he thrashed around on the bed and yelled profanities.

[7] On June 29, 2018, the State charged Johnston with: Count I, domestic battery as a level 6 felony; Count II, criminal mischief as a class B misdemeanor; Count III, attempted domestic battery as a level 6 felony; Count IV, disorderly conduct as a class B misdemeanor; Count V, disorderly conduct as a class B misdemeanor; Count VI, public intoxication as a class B misdemeanor; and Count VII, resisting law enforcement as a class A misdemeanor. The State also alleged that Johnston was an habitual offender. The State later filed an amended information to add a second count of resisting law enforcement as a class A misdemeanor as Count VIII.

[8] On August 30, 2018, the court held an initial hearing at which Johnston's counsel was present and the following exchange occurred:

> THE COURT: . . . Officer McIntyre, has Mr. Johnston been brought to the courthouse?
>
> OFFICER MCINTYRE: Yes, Your Honor.
>
> THE COURT: The Court has been advised that he has called you profane names, he tore up his paperwork all over the cell, called his attorney profane names and now refuses to come to court, is that correct?
>
> OFFICER MCINTYRE: Yes, Your Honor.

THE COURT: And did you tell him that the Court was ordering that he appear in court?

OFFICER MCINTYRE: Yes, Your Honor.

THE COURT: And he refuses to do that?

OFFICER MCINTYRE: Yes, Your Honor.

THE COURT: He says that you are going to have to carry him in here?

OFFICER MCINTYRE: Yes, Your Honor.

THE COURT: What is his reason for not coming to court, do you know?

OFFICER MCINTYRE: He advised that he felt that his life was threatened and when I advised him that he needed to go to court for his initial hearing, he relayed that he would like the Judge to know that she can lock him up and throw away the key.

Transcript Volume I at 4. Johnston's counsel indicated to the court that he was comfortable having the hearing without his client present and that he would make sure to relay that information to him.

[9] That same day, the court held a status hearing at which Johnston's counsel was present, and Johnston appeared by video from the Montgomery County Jail. The court informed Johnston that a testimonial deposition was scheduled, and he indicated that he wished to be present. The court and Johnston engaged in a discussion, and the following exchange occurred:

THE COURT: Sir, they had you at the courthouse. You were swearing at the officers. You wouldn't come into the courtroom. They had to carry you out of the building.

[Johnston]: Oh yeah, they did have to carry me out because right now if I don't get charged with these charges that's not relevant to the case, you know what I'm saying?

THE COURT: I don't know what you're saying.

*Id.* at 20.

[10] On September 10, 2018, the court held a hearing and informed Johnston that he had the right to "confront and cross-examine the witnesses against you, to see them, hear them, and ask them questions." *Id.* at 52. On September 13 and 14, 2018, the court held additional hearings. At the September 14th hearing, the court told Johnston that his attorney advised it earlier that he had considered potentially pleading guilty to some charges and then taking the remainder of the charges to trial and the court asked Johnston how he wanted to proceed, and Johnston answered: "I'm willing to go to trial on all of them, ma'am." *Id.* at 68. The court responded by saying in part: "The Court was actually going to give you a deadline of today because we can't make the State prepare for trial not knowing what they can and can't discuss, not knowing what you want to plead guilty to or not." *Id.* The court also stated that it would schedule the entire case for jury trial.

[11] On September 17, 2018, the court held another hearing and stated:

I just want to be sure, Mr. Johnston, that you are clear that when the jury is present that you will continue to behave yourself and be respectful as you have been in court and I appreciate that, but I want you to know that a jury trial is not a circus and this Court will not allow it to be a circus. So, if it is your intention to

> somehow come in and make a scene or to make arguments or to
> have outbursts or to misbehave, the Court will not condone that
> in any way, shape, or form.

*Id.* at 73. Johnston indicated that he understood.

[12] On September 18, 2018, the court held a hearing, and Johnston indicated that he wished to proceed *pro se* and wanted to proceed with standby counsel. After further discussion, the court informed Johnston that it would not permit him to act inappropriately or to attempt to taint the jury, and Johnston indicated that he understood. That same day, the court held a second hearing and stated: "We are assembled for a jury trial upstairs and the Court has been advised, Mr. Johnston, that you want to plead guilty today." *Id.* at 91. Johnston indicated it was his intention to plead guilty "as long as the (indiscernible) gets a plea, the prosecutor is willing to agree to the terms of it and you are willing to agree . . . ." *Id.* After a discussion, Johnston stated: "I want to go to trial." *Id.* at 94. The court stated: "All right. Don't waste anymore of my time, Mr. Johnston." *Id.* The court took a recess and when it reconvened, the court and Johnston engaged in a discussion regarding proceeding without an attorney in which Johnston asked multiple questions.

[13] During *voir dire* that same day, the court indicated that there would be six jurors, Johnston called for a recess to discuss why it was earlier stated twelve jurors, and the court indicated that it was mistaken, that it had thought twelve, and that the rule calls for six. Johnston asked to see the law, and the court

stated that it would not show him the law and that it would not break every time he had a question to review the law.

[14]    During *voir dire*, Johnston asked the potential jurors multiple questions. After the jury was selected, the following exchange occurred:

> [Johnston]: I just came to the realization I was hearing voices earlier. I don't even know what's going on. I thought I signed a plea earlier. What's going on?
>
> THE COURT: Mr. Johnston, you attempted to enter a plea earlier today and you withdrew from it. We are in trial.
>
> [Johnston]: I thought I already signed a plea though. What is going on?
>
> THE COURT: We are not doing this today, Mr. Johnston.
>
> [Johnston]: But I thought I already signed a plea, like, why is [sic] we here? I don't even know what's going on.
>
> THE COURT: Well, you selected a jury and you did a pretty good job of it –
>
> [Johnston]: When?
>
> THE COURT: - so, to pretend now that you don't know what's going is [sic] not going to fly. You are not going to waste this Court's time.
>
> [Johnston]: I don't know what's going on. I thought I signed a plea. What's going on?
>
> THE COURT: Well, we are in trial and you are going to finish this trial today.
>
> [Johnston]: Trial where? Where is the trial at? I don't even know what's going on.

THE COURT: Mr. Johnston, you can participate in trial, you are representing yourself, or you can be removed from the proceedings and we will have the trial without you.

[Johnston]: But I don't even know what's going on. I just came down off a high. I was high all day. I just came off a high. I'm trying to get explained to me what's going on. I've been high all day off of drugs. I'm trying to figure out what's going on.

THE COURT: Okay. Well, that means you're using drugs in the jail. That means you're in contempt of court for coming to my courtroom high. So, would you like to serve an additional thirty days in jail for coming to my courtroom high?

[Johnston]: I don't even know what's going on right now.

THE COURT: It's a yes or no question. Do you want an additional thirty days in jail for coming to my courtroom high or do you not?

[Johnston]: I'm telling ya'll I was high. I don't even know what's going on.

THE COURT: All right. You just got yourself thirty days for contempt of court.

[Johnston]: I'm trying to figure out what's going on. What is going on right now?

THE COURT: Well, we are in the middle of a jury trial.

[Johnston]: How did I get in a jury trial? I signed a plea this morning.

THE COURT: We are going to have you removed and we will finish these proceedings without you. Mr. Moore will take over as counsel. You're not going to make a mockery of this Court. I have told you that several times. We have had seven pretrial conferences for this jury trial. Seven.

[Johnston]: I said I wanted to sign a plea this morning, though, why didn't I sign – where's the plea at?

THE COURT: You didn't sign a plea, sir.

[Johnston]: I did sign the plea.

THE COURT: You can take him back down to the jail.

[Prosecutor]: Your Honor, the State's concerned and I can't that [sic] I know that I have case law at hand. I'm concerned that if we do a trial *in absentia* for a defendant that is removed and if the Court appoints counsel in a case where he's basically elected to go pro se and all that, I'm concerned we're just going to have to come back and do this again.

THE COURT: And we may. The fact is we had seven pretrial conferences because Mr. Johnston continues to try to abuse the process of this Court and of this system. And I have made it very clear that you're not going to do that.

[Johnston]: I thought I signed a plea this morning.

THE COURT: You don't get to talk, Mr. Johnston. I'll tell you when it's your turn to talk. You have repeatedly refused to talk to your attorneys, you have refused to meet with your attorneys, you have refused to walk into the courtroom and had to be carried. I could summarize all of the different reasons that the Court continues to admonish you that you're not going to make a mockery of this system. That you're not going to act inappropriately in front of the jury. That you're not going to create an issue for a mistrial. You're not going to do that. You wanted a jury trial, we are here for a jury trial, you have attempted on numerous occasions to plead guilty and then withdrawn your plea at the last minute. We had three pretrial conferences before the jury selection even began. Three pretrial conferences this morning.

[Johnston]: I told him I wanted to sign a plea this morning, though. I was, I was, he never, I signed it, right?

THE COURT: But the Court doesn't buy that you're suddenly incompetent. I don't buy it.

[Johnston]: I'm saying I signed a plea this morning. I told my lawyer to sign it. Why am I here?

THE COURT: You're here for a jury trial and we are either going to have a jury trial with or without you. We are going forward with a trial today, sir. So, you can participate in the trial or we can send you back down to the jail and have your trial without you, it's really that simple.

[Johnston]: But I thought I signed a plea. I don't know what's going on.

THE COURT: Well, I don't believe that you're suddenly incompetent. You just selected a jury.

[Johnston]: I'm telling you, I don't know what's going on. I thought I signed a plea. I was willing to sign the plea.

* * * * *

THE COURT: Well, right now you're pretending to not be competent and so, you're going to get your wish. The Court's going to take you out of the courtroom and we'll have your trial without you. That's where we are.

[Johnston]: So, I'm having trial. I thought I signed a plea though, what am I here for?

THE COURT: Take him.

([Johnston] removed from courtroom)

THE COURT: Mr. Johnston, has been removed from the courtroom. He has been taken back to the jail. The Court's

options at this point are to proceed without him and have Mr. Moore appear as his counsel. Mr. Moore was prepared for trial until this morning when Mr. Johnston proceeded to insist on representing himself so, Mr. Moore, I assume you are prepared for a jury trial today?

MR. MOORE: I am, Your Honor.

THE COURT: All right. So, the Court's options are to proceed without him and do that *in absentia*. As the Court summarized previously on the record, Mr. Johnston has refused to walk into the courtroom and forced security to carry him previously. He has refused to meet with his attorney on several occasions. He has agreed to meet with his attorney on several occasions and then refused to confer with him. He has attempted to enter a plea agreement on at least two occasions and then withdrawn that plea. We have had seven, I believe, pretrial conferences, in the last two weeks getting ready for this trial and three of those occurred this morning prior to the jurors being selected. He participated in jury selection. He did a phenomenal job for a person who does not have a legal degree and so now has asked the security officer if his plea was still an option and then also asked if he could meet with counsel and the Court alone off the record and when those requests were denied he is not pretending to be incompetent. And frankly, I have zero more patience for him. So, State, the options are to proceed without Mr. Johnston with his court-appointed attorney resuming the role of counsel, or to declare a mistrial.

[Prosecutor]: Yes, Your Honor. The State would prefer to proceed with him absent and with Mr. Moore representing his interests under the circumstances.

THE COURT: All right. The Court will appoint you, Mr. Moore, to represent [Johnston's] interests in this matter, understanding that you have prepared for this trial and were ready to represent him up until this morning and so the jury is what it is. It's who he selected. So, from this point forward you

are his representative and the Court understands that that may not be what you thought was going to be the outcome but you are an able-bodied attorney. You have done jury trials before and I know that whatever personal differences you and Mr. Johnston may have, you will be able to put those aside so that you can adequately represent him proceeding from here on.

Transcript Volume I at 205-212.

[15] Johnston's counsel requested either a continuance or a mistrial, and the court denied the motions. Howard, Officer Payne, Officer Manago, and Corporal Huckstep testified.

[16] At the beginning of the second day of the trial, the court held a hearing outside the presence of the jury at which Johnston was present. The court stated: "Mr. Johnston, the Court had you removed from the courtroom yesterday because you refused to participate in the jury trial further. The Court had you brought up today to see if you're ready to participate in the trial." Transcript Volume II at 35. Johnston stated that he was on some sleeping medications and did not remember what happened and that he did not want his attorney. The court informed him that "even though you have the constitutional right to represent yourself the Court can only permit that if you demonstrate that you're competent to do it" and that he had acted "in a way that demonstrated that you were no longer competent to represent yourself." *Id.* at 35. After some discussion, Johnston indicated that he would participate.

[17]    Depositions of Brooks and Reams were played for the jury.[2]  Johnston stated that he had a question, and the court informed him that he was not permitted to speak out.  Johnston stated that his public defender was not representing him, and the court held a hearing in the absence of the jury.  He stated that he wanted to represent himself, that he asked for a continuance the previous day, and referenced the jurors.  The court stated: "So, today you remember selecting a jury and yesterday you pretended that you did not."  *Id.* at 62.  After a discussion, the court stated:

> You will not represent yourself any further and Mr. Moore will remain as your public defender as he has been throughout the duration of this case.  You will not have any outbursts in front of the jury.  You will not act up and mess up this trial trying to get a mistrial so that you can get a new one.

*Id.* at 66-67.

[18]    After the State rested, Howard began to testify, the court asked her if it would be okay if a court staff member sat in the hallway with her children, she answered affirmatively, and Johnston then stated that he loved them and "Get me out of here, man, I'm done.  Take me out of here."  *Id.* at 70.  The court stated that the "record should reflect that Mr. Johnston has removed himself from the proceedings."[3]  *Id.*  Howard testified that she and Johnston argued, he

---

[2] In their depositions, Brooks and Reams testified that they were moving to Mississippi.

[3] After the defense rested, the court stated: "[F]or the record, when the children were brought into the courtroom, Mr. Johnston turned around to try to speak to them.  The children were being taken out and he was telling them that he loved them.  He then got up, appeared to be crying, and said that he was out of here

threw phones into the television and told her to "get the f--- out," and she hit him with a "closet stick" or "dowel rod." *Id.* at 73-74. She testified that he had a brick, she tried to "get the brick away from him," he "was swinging the brick around and pushing [her] hands off of him," and she hit him with the stick again. *Id.* at 75. She stated that he was determined to break the windshield and threw a brick at the windshield while she and her children were in the vehicle. On cross-examination, Howard testified that Johnston's income was important to her and that she wants Johnston in her children's lives. After the prosecutor played a portion of the video of bodycam footage from Corporal Huckstep, Johnston indicated that it sounded like she told Corporal Huckstep that Johnston shoved her, but she asserted that he did not shove her during further questioning by the prosecutor. She denied that Johnston threw big toys. The prosecutor asked: "[Y]ou used that stick to defend yourself back on June 25th, right?" *Id.* at 90. She answered: "I guess you could say that, yes." *Id.*

[19] The jury found Johnston guilty of: Count I, domestic battery as a level 6 felony; Count II, criminal mischief as a class B misdemeanor; Count IV, disorderly conduct as a class B misdemeanor; Count V, disorderly conduct as a class B misdemeanor; Count VII, resisting law enforcement as a class A misdemeanor; and Count VIII, resisting law enforcement as a class A misdemeanor. The jury found him not guilty of Count III, attempted domestic battery as a level 6

and walked out of the courtroom on his own accord. He then was taken to the lock-up area I assume and at some point broke away from security and there was a loud commotion in the hallway." Transcript Volume II at 95.

felony, and Count VI, public intoxication as a class B misdemeanor. The jury also found that he was an habitual offender.

[20] The court sentenced Johnston to two and one-half years for Count I, 180 days each for Counts II, IV, and V, 365 days each for Counts VII and VIII. The court ordered that the sentences be served concurrent with each other and ordered that his sentence was enhanced by four years for his status as an habitual offender.

## *Discussion*

### I.

[21] The first issue is whether the trial court properly removed Johnston from the courtroom. He argues that his allegedly disruptive conduct was not sufficient to constitute a waiver of his right to be present at trial. He asserts that waiver of the right to be present requires actual substantial or pervasive disruptive behavior that makes the trial impractical and not merely the expectation that the defendant will misbehave in front of the jury. He also contends that his removal is problematic because he was not advised of his right to reclaim his right to be present upon a promise to conduct himself properly. The State argues that the trial court acted within its discretion when removing Johnston during part of his jury trial in light of his repeated attempts to obstruct and delay his trial.

[22] A criminal defendant's right to be present at his trial derives from the Sixth and Fourteenth Amendments to the United States Constitution and Article 1,

section 13 of the Indiana Constitution. *Campbell v. State*, 732 N.E.2d 197, 204 (Ind. Ct. App. 2000). However, a defendant's right to be present under either the United States Constitution or Indiana Constitutions may be waived if such waiver is knowing and voluntary. *Id.* (citing *Harrison v. State*, 707 N.E.2d 767, 785 (Ind. 1999), *reh'g denied*, *cert. denied*, 529 U.S. 1088, 120 S. Ct. 1722 (2000)). The United States Supreme Court has held:

> a defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom.

*Illinois v. Allen*, 397 U.S. 337, 343, 90 S. Ct. 1057, 1060-1061 (1970) (footnote omitted). "[T]rial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case." *Id.*, 90 S. Ct. at 1061. In *Campbell*, we noted that, although the United States Supreme Court in *Allen* was only addressing the Sixth Amendment right to be present at trial, "we can perceive of no reason why an identical waiver rule should not also be applicable to Article I, section 13 of the Indiana Constitution." *Campbell*, 732 N.E.2d at 205.

[23] The record reveals that Johnston refused to appear in court on August 30, 2018. On September 17, 2018, the court informed Johnston that he would have to behave and that it would not permit him to act inappropriately. During *voir dire*, Johnston asked the potential jurors multiple questions. After the jury was

selected, Johnston stated that he was hearing voices earlier, thought he had signed a plea, and did not know what was going on. The court informed Johnston that he could participate in the trial or be removed from the proceedings. After a lengthy discussion, the court stated that Johnston had repeatedly refused to talk to his attorneys, refused to meet with them, and refused to walk into the courtroom and had to be carried. The court also stated that it did not believe that Johnston was suddenly incompetent. The court again informed Johnston that he could participate in the trial or be removed, and Johnston again stated that he did not know what was going on even though he had just finished selecting a jury. The court found that Johnston was pretending to be incompetent and removed him from the courtroom. We also observe that Johnston was present at the second day of the trial, the court informed him that he would not have any outbursts, and Johnston later demanded to be taken out of the courtroom. Under these circumstances, we cannot say that the trial court abused its discretion.

## II.

[24] The next issue is whether Johnston's conviction for disorderly conduct violates double jeopardy. Johnston argues that his conviction for Count IV, disorderly conduct, violates basic common law double jeopardy principles by upholding multiple convictions for the same act. He asserts that if Count IV is based on the act of physical violence, then the same act supports Count I, domestic battery, and that, if Count IV is based on substantial damage to property, then it is based on the very same act of property destruction that supports Count II,

criminal mischief. The State points to Johnston's convictions for domestic battery and disorderly conduct and asserts that "[t]hese two convictions do not run afoul of the actual evidence test." Appellee's Brief at 28.

[25] The Indiana Constitution provides that "[n]o person shall be put in jeopardy twice for the same offense." IND. CONST. art. 1, § 14. "Indiana's Double Jeopardy Clause . . . prevent[s] the State from being able to proceed against a person twice for the same criminal transgression." *Hopkins v. State*, 759 N.E.2d 633, 639 (Ind. 2001) (quoting *Richardson v. State*, 717 N.E.2d 32, 49 (Ind. 1999)). The Indiana Supreme Court has held that "two or more offenses are the 'same offense' in violation of Article I, Section 14 of the Indiana Constitution, if, with respect to either the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." *Richardson*, 717 N.E.2d at 49. "On appeal, the defendant bears the burden to show that his convictions violated his constitutional right to be free from double jeopardy." *Boyd v. State*, 766 N.E.2d 396, 400 (Ind. Ct. App. 2002) (citing *Lutes v. State*, 272 Ind. 699, 401 N.E.2d 671, 672-673 (1980)).

[26] In order to find a double jeopardy violation under the actual evidence test, a defendant must demonstrate and a reviewing court must conclude that there is a reasonable possibility that the evidentiary facts used by the factfinder to establish the essential elements of an offense for which the defendant was convicted or acquitted may also have been used to establish all the essential elements of a second challenged offense. *Hines v. State*, 30 N.E.3d 1216, 1222

(Ind. 2015); *Vestal v. State*, 773 N.E.2d 805, 806 (Ind. 2002), *reh'g denied*. "[A] 'reasonable possibility' that the jury used the same facts to reach two convictions requires substantially more than a logical possibility." *Garrett v. State*, 992 N.E.2d 710, 719 (Ind. 2013) (quoting *Lee v. State*, 892 N.E.2d 1231, 1236 (Ind. 2008)). The existence of a reasonable possibility turns on a practical assessment of whether the fact-finder may have latched on to exactly the same facts for both convictions. *Id.* at 720. "Application of this test requires the court to 'identify the essential elements of each of the challenged crimes and to evaluate the evidence from the jury's perspective . . . .'" *Hines*, 30 N.E.3d at 1222 (quoting *Lee*, 892 N.E.2d at 1234 (quoting *Spivey v. State*, 761 N.E.2d 831, 832 (Ind. 2002))). The Indiana Supreme Court has determined the possibility to be remote and speculative and therefore not reasonable when finding no sufficiently substantial likelihood that the fact-finder used the same evidentiary facts to establish the essential elements of two offenses. *Hopkins*, 759 N.E.2d at 640 (citing *Long v. State*, 743 N.E.2d 253, 261 (Ind. 2001), *reh'g denied*; *Redman v. State*, 743 N.E.2d 263, 268 (Ind. 2001)). "In determining the facts used by the fact-finder, 'it is appropriate to consider the charging information, jury instructions, [ ] arguments of counsel' and other factors that may have guided the jury's determination." *Hines*, 30 N.E.3d at 1222 (quoting *Lee*, 892 N.E.2d at 1234 (citing *Spivey*, 761 N.E.2d at 832, and *Richardson*, 717 N.E.2d at 54 n. 48)).

[27]  Count I, domestic battery as a level 6 felony, alleged that Johnston

> did knowingly or intentionally touch Shameka R. Howard, a
> family or household member in a rude, insolent, or angry

manner, to wit: shoved her to the ground in the presence of M.J.,
age one (1) and A.J., age four (4), and [he] committed said
offense in the presence of a child less than 16 years of age,
knowing that the child was present and might be able to see or
hear the offense.

Appellant's Appendix Volume II at 14-15. Count II, criminal mischief as a class B misdemeanor, alleged that Johnston "did, without the consent of Shameka R. Howard, recklessly, knowingly or intentionally damage or deface the property of Shameka R. Howard, to-wit: a vehicle." *Id.* at 15. Count IV, disorderly conduct as a class B misdemeanor, alleged that Johnston "did recklessly, knowingly or intentionally engage in fighting or tumultuous conduct with Shameka Howard." *Id.* The court informed the jury that tumultuous conduct "means conduct that results in, or is likely to result in, serious bodily injury to a person or substantial damage to property." Transcript Volume II at 117.

[28] During closing argument, the prosecutor did not delineate which acts related to each specific count. The charging information and jury instructions also did not specify that the acts alleged under Count IV were different from those alleged in Counts I or II. We conclude that there is a reasonable possibility that the jury relied upon the same evidentiary facts to support Count IV as it did to support Counts I or II and that Johnston's conviction for Count IV violates double jeopardy principles. A violation of double jeopardy principles requires that we vacate the conviction with the less severe penal consequences. *Moala v. State*, 969 N.E.2d 1061, 1065 (Ind. Ct. App. 2012). We vacate the conviction

for disorderly conduct under Count IV and remand with instructions to enter an amended abstract of judgment and an amended sentencing order.[4]

## III.

The next issue is whether Johnston's sentence is inappropriate in light of the nature of the offenses and his character. Johnston argues that he received the maximum sentence for Count I, domestic battery as a level 6 felony. He asserts that his offense was less egregious than the typical offense contemplated by the legislature and that it involved a push or shove and he did not hit or strike the victim and the victim did not suffer any injury. He contends that he expressed remorse for his conduct. He acknowledges his criminal history but argues that all three of his felony convictions are already used against him to allow a four-year prison sentence enhancement. The State argues that nothing about the nature of his offenses or character justifies revision.

Ind. Appellate Rule 7(B) provides that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [we find] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Under this rule, the burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

---

[4] This does not impact Johnston's aggregate sentence.

[31]     Ind. Code § 35-50-2-7 provides that a person who commits a level 6 felony "shall be imprisoned for a fixed term of between six (6) months and two and one-half (2 ½ ) years, with the advisory sentence being one (1) year." Ind. Code § 35-50-2-8(i) provides that "[t]he court shall sentence a person found to be a habitual offender to an additional fixed term that is between . . . two (2) years and six (6) years, for a person convicted of a Level 5 or Level 6 felony." Ind. Code § 35-50-3-2 provides that "[a] person who commits a Class A misdemeanor shall be imprisoned for a fixed term of not more than one (1) year," and Ind. Code § 35-50-3-3 provides that "[a] person who commits a Class B misdemeanor shall be imprisoned for a fixed term of not more than one hundred eighty (180) days."

[32]     Our review of the nature of the offenses reveals that Johnston shoved Howard, swung at her, pushed her into the street, and "[s]macked her around several times." Transcript Volume II at 42. While Howard was attempting to leave with the children in the car, Johnston picked up a brick and threw it at the window which shattered. We note that Reams testified that Johnston was the aggressor and that Howard "was doing everything she could to stay away from him." *Id.* at 52. He refused to cooperate with Officer Payne, tried to walk past and away from him, continued to pull away from him when Officer Payne grabbed him, and tried to "get away" from him. Transcript Volume I at 243. At one point, Corporal Huckstep and other officers tried to keep Johnston safe and secure on a gurney and had to hold his legs or arms while he thrashed around on the bed and yelled profanities.

[33] Our review of the character of the offender reveals that Johnston's criminal history includes convictions for sale of cocaine as a felony and willful obstruction of law enforcement officers in 2008; possession of a controlled substance as a felony and obstruction of an officer as a misdemeanor in 2009; "Battery (family violence)" and "Cruelty to Children 3rd degree" as misdemeanors in 2015; and auto theft as a level 6 felony and leaving the scene of an accident as a class B misdemeanor in 2016. Appellant's Appendix Volume II at 196.

[34] After due consideration, we conclude that Johnston has not sustained his burden of establishing that his aggregate sentence of six and one-half years is inappropriate in light of the nature of the offenses and his character.

## *Conclusion*

[35] For the foregoing reasons, we vacate Johnston's conviction for disorderly conduct as a class B misdemeanor under Count IV, affirm his other convictions and aggregate sentence, and remand to the trial court to enter an amended sentencing order and abstract of judgment.

[36] Affirmed in part, reversed in part, and remanded.

May, J., and Mathias, J., concur.